Case number 22-2741 from Nebraska, Nebraska Furniture Mart v. Guardsman US. Mr. Reese. Yes, Your Honor. You may proceed. Thank you, Your Honors. Counsel, may it please the Court. My name is Jared Reese. I represent Nebraska Furniture Mart in this matter. The retailer agreement that is at issue unambiguously required Guardsman to pay Nebraska Furniture Mart the trade program funds for calendar year 2020. And to the extent that it did not, Guardsman agreed to make that payment in a separate funding program agreement document that was executed in March 2020. We therefore ask that the judgment below be reversed and that the case be remanded for entry of judgment in favor of Nebraska Furniture Mart. I'd like to begin by outlining why Nebraska Furniture Mart prevails under the plain language of the retailer agreement and then address why the funding program agreement removed any doubt on that point. As Your Honors are aware, Delaware adheres to the objective theory of contracts. That analysis begins with the plain text of the retailer agreement. The retailer agreement clearly provides for an annual payment. It's called the annual trade program. There's a sentence in the agreement that says the trade program funds are paid annually. The only way to objectively interpret that language is to reach the conclusion that an annual payment is required for calendar year 2020, the last year of the agreement's term. Guardsman seeks to avoid that obligation by pointing to the reinvestment language that is in the trade program. That language says that the trade program funds are to be reinvested in the Guardsman protection program. And they claim that that means no payment is owed for the last year since the funds could not be reinvested at that point. But that conclusion is inconsistent with the retailer agreement's survival clause. The survival clause says that a term survives expiration of the retailer agreement if it expressly survives or if the context reasonably requires that it survive. We'd like to note that the payment obligation and the reinvestment term are separate terms for purposes of the survival clause. That's the point that we've made by reference to Section 3 of the retailer agreement. And there's no dispute between the parties in the district court acknowledge that the reinvestment obligation has lapsed. So the question is, did the payment term survive even though the reinvestment term lapsed? The answer to that question is yes, under both prongs of the survival clause. The expressly survives clause is satisfied by the language that says that the annual trade program funds will be paid annually. And to the extent that's not the case, the context reasonably requires that payment to be made for three related reasons. The first is that there's no textual carve-out for the last year of the contract's term. There are other textual carve-outs. For instance, the trade program section of the agreement says that if Nebraska Furniture Mart doesn't pay Guardsman, Guardsman doesn't owe Nebraska Furniture Mart the trade program funds. And that makes sense. It also shows that Guardsman knows how to negotiate for and obtain exceptions to its obligation to pay the annual trade program funds when it believes that they should not be paid. The second reason that the context reasonably requires that the payment be made is that the retailer agreement contained language that may have allowed Guardsman to get out of its obligation to pay the trade program funds for the last year if it appropriately invoked that provision. That language says that Guardsman has the right to—excuse me, the trade program fund is subject to change if NFM changes vendors in any of the protection categories. But that language is tied to a restriction on Guardsman's ability to do so. And that is that Guardsman, if it's going to make any changes, is obligated to give Nebraska Furniture Mart at least 30 days' notice in advance. And that would then trigger Nebraska Furniture Mart's right to terminate the retailer agreement as a whole and get out of the retailer agreement, thereby enabling it to change vendors even earlier than it intended to do so. What about the condition of spending the money on the Guardsman protection—the promotion of Guardsman protection programs? I think they talked about it being to enhance sales. They used a technical term for enhancing sales. That seems like a condition for the payment to make, right? You get paid, but the condition for that payment is that you then spend the money on promoting the sale of Guardsman's protection programs. And if that condition is now impossible because Guardsman's no longer affiliated with Nebraska Furniture Mart, then it seems to me that it's game over. Well, I appreciate Your Honor's question, and I think it's similar to the district court's point about what it viewed as the purpose of the trade program. What I would note is that Guardsman hasn't argued that that language is a condition, a condition being something that has to be satisfied before the obligation kicks in. They've argued that it was an obligation of theirs, and it lapsed. And so because that obligation has lapsed, their payment obligation has lapsed as well. But what I would note about that is that it's our client's argument that provides the incentive to increase sales, not theirs. So under my client's interpretation for year 2020, if the trade program funds are paid, as they should be because they were owed, Nebraska Furniture Mart gets that 5%, for lack of a better term, commission for having sold those Guardsman plans throughout the year. That 5% rebate was an incentive to Nebraska Furniture Mart to sell more. We all understand the intuitive point. The higher your rate of commission is on a transaction, the greater the incentive you have to consummate the sale. Well, can you possibly – I mean, if you were paid this money, could you in 2021 or 2022 have spent that money in a way that promotes the Guardsman's protection plans? That's the problem I'm having because that's what the contract requires. Well, Your Honor, the contract does contain that language. That obligation to spend those funds has lapsed, and it lapsed with the end of the agreement. But it does bring me to the relevance of the funding program agreement in this analysis. That document was signed in March 2020, the year that we're here discussing, after the 2019 trade program funds had already been paid. And that document says unambiguously that a 5% rebate will be paid for calendar year 2020. If that document is to have any meaning, it must mean that Guardsman – What's that document? The funding program agreement, Your Honor. It is in the record. Exhibit 2. It's a couple of places in the district court record, in the joint appendix. It is pages 28 and 29. Well, that leads to the question, if this retailer agreement was already in place, what was the purpose of this funding program document? You say it's an agreement, and it does say – it says disagreement. But what's the purpose of that? Well, Your Honor, the purpose is not in the evidentiary record, but from reviewing the document. It makes changes beyond the discussion of the 5% rebate. Most notably, it contains an agreement by Guardsman to pay my client an additional – I believe that year it was $125,000. It's in that ballpark of what they call anniversary support for continuing to participate in the program. But it also changes the payment terms in three respects. It changes the amount of time my client had to make a payment. It changes the discount they got for making a timely payment. And it changes the method by which my client was to make that payment. Before, it was by credit card. And after the funding program agreement, it was by ACH, or automated clearinghouse transfer. So the purpose of the agreement, just from looking at its face, was either to confirm or change certain terms related to the rebate. We think it was to confirm that that rebate was owed. But if it didn't, it certainly clarified any ambiguity or doubt on that point. And it also made those other changes as well. I want to get back to the retail agreement, which is – is your argument that the rebate survives but the obligation to use that rebate does not survive for the promotion of the Guardsman's programs? In a sense, the answer to that question is yes, Your Honor. And that's because the 5% can't be calculated until the clock strikes midnight at the end of the year. So that next minute, if the books were up to date, the payment could be calculated and made. So it requires it to survive only as long as it takes for the calculation to be made and for the payment to be made. Now, my next question is how does that make sense? I have never seen a situation in which you have essentially two interrelated sentences in the same provision, two sentences apart, where one obligation survives and another obligation dealing with that first obligation doesn't survive. I just – I can't think of an example. I don't know if you might have one. Well, it's difficult to think of examples from practice, but I could point, Your Honor, to paragraph 3 or section 3 of the funding program agreement where in the very same sentence it spells out two distinct obligations that are related. So the caption to section 3 is something like obligation to provide a plan to consumers. That's the title of the section. And then the first or second sentence says two things separated by a comma. One is that if a customer, a prospective customer, asks Nebraska Furniture Mart for a copy of the plan, they have to give it to them. The second says that if the transaction has been consummated and the customer goes to Guardsman and says, I'd like a copy of my plan, Guardsman has to give it to them. They're in the same sentence. Now, Nebraska Furniture Mart wouldn't have an obligation to give a prospective customer a copy of the Guardsman plan in 2021 because they're not selling Guardsman plans. But Guardsman has an obligation, and if you apply the survival clause, Guardsman has an obligation to continue to provide those plans to customers who request them because Guardsman remains under an obligation under a separate provision in the agreement to continue servicing those plans. So the service obligation expressly survives, and then the obligation to provide the plans survives under the context language in the survival clause. Okay, now onto the questions that Shepard was asking about. One of the problems with that later document—I wouldn't call it an agreement because both parties didn't sign it—is the fact that both parties didn't sign it. So at most, would you agree that it's sort of extrinsic evidence of intent, or do you think it's actually binding even though one party signed it? The latter derived for a few reasons. One is there's no doctrine in Delaware that says that both parties have to sign an agreement. What it requires is mutual assent, and mutual assent can be evidenced in certain situations like in the retailer agreement by a signature of both parties. Another way is for one party to propose a transaction and to say that by taking a certain step and sending it back, you've agreed to the terms. The top of the funding program agreement says—and this is a rough paraphrase—but it says, execute and return to your buyer at Nebraska Furniture Market. And that's what Guardsman did. So there's mutual assent to the agreement by Nebraska Furniture Market proposing it and Guardsman accepting it. Well, do you concede that it's not signed by Nebraska Furniture Market? It's not signed in the sense of a signature, but there's a case that we cite—I can't recall the name, it's in a parenthetical in that section of our brief— that talks about how by proposing the document with its letterhead and its trappings, the offer, that that serves the role of the signature. So there's not an ink with a name written, but the signature is provided in effect. Yeah, I was wondering about that. It says Nebraska Furniture Market printed at the top. Yes, Your Honor. It sounds like we're back at law school talking about these terms, but it is very much like this argument that actually it is signed. I'm sorry, Your Honor, I missed that question. That actually it is signed by Nebraska Furniture Market. Correct, Your Honor. It's the difference between the legal definition of signature and the way we use it in ordinary conversation, but I would agree with you. And if I may, I reserve the balance. So let me make sure. Are you conceding that it's not, in the sense necessary to create contract, you're conceding that it's not signed by Nebraska Furniture Market? I want to be careful how I answer that, because there's clear case law that provides mutual assent, and there are examples in our brief where one party sends something with no signature on it and says, send it back and you agree to it. That is mutual assent. There's a separate but related line of cases that says Nebraska Furniture Mart's insignia at the top of that, calling it an agreement and sending it out, serves the role of the signature and functions as a signature for purposes of contract law. The other quick question I had was the 5% rebate that's on those subsequent documents. How do we know, I mean, other than by inference, that it's referring – because it uses different terminology than the underlying retail program agreement. How do we know that they're talking about the same things? Well, one is the context. The number matches. It describes rebate. It describes the same annual term. But I would also note as a procedural matter that argument has never been raised by guardsmen, and the district court noted that. All of the parties have operated under the understanding, and there's never been an argument to the contrary that those two were referring to the same thing. So I appreciate your question. I don't think it's before the court. And if I may, I reserve the balance of my time. Very well. Mr. Roth. Thank you, Your Honor, and may it please the court. Pursuant to the parties' contract, at the beginning of each year, guardsmen sent trade program dollars to Nebraska Furniture Mart. By express contractual term, it's undisputed that those funds had to be reinvested in the guardsmen protection program to help increase sales of those plans. Near the end of 2020, NFM decided not to renew the parties' 20-year relationship, which did end the contract. But once it became 2021, even though there was no longer a trade program to operate, and even though Nebraska Furniture Mart could no longer fulfill its obligation, its contractual obligation, to reinvest those funds, it maintained that it was entitled to that payment, and that that payment could simply go to its bottom line at that point. This is a quintessential request for a windfall. It's disconnected from the express contractual language, and it's also disconnected from the principles of Delaware law that control in this case. As was discussed in my friend's argument, I think this really comes down to sort of two modes of analysis. Either one, it's the plain language of the agreement that they believe through the survival clause requires this payment, or two, it's this separate funding program document that they believe was an actual amendment to the agreement and thereby required this payment. Both of these arguments are flawed, and the district court properly rejected each of them. I think if we start with the plain language of the agreement, and I think Judge Strassel's questions fit on this, there are two obligations here. There's an obligation to make the payment, and then there's an obligation that those funds be reinvested. The way I understand the argument is that you have to look to the survival clause, and the survival clause says if the, quote, context reasonably requires a term to survive, then it should survive. If you look to the payment obligation, I think we have to look, because again, Delaware law, I think we both agree on this, you go with the plain language of the agreement, what it says. And the clause that they want to survive reads, the trade program is paid annually and will not be issued if retailer has a past due balance. That's the sentence. So the trade program is paid annually. In order for that sentence to make any sense whatsoever, to have any meaning as to what a, quote, trade program actually is, you have to look to the other provisions of that same paragraph that describe exactly what that trade program is. It's that the trade program dollars are to be reinvested to increase sales in the next year. That's the only reasonable construction of this entire paragraph. It also comports with Delaware law, because all of those principles say that we don't interpret terms in isolation, that we give meaning to all of them, and that we don't construe it to lead to an absurd result, which is what you would get here, because as Judge Strauss pointed out, you're going to have a situation where you have a windfall payment to one side without the other side receiving the benefit that they negotiated for in the context of this agreement. I'm not sure that's absurd. If this is paid as a commission and not to improve sales, so you ignore the improved sales part of it, I don't find that absurd. A lot of things are paid on commission. That's right. And if it was set up as a commission, I think I would agree with you. Two points on that. First of all, it would require you to read out the reinvestment provision. I think that's the first problem with it. Secondly, if you look at how the relationship, and this is in the undisputed facts, I believe it's paragraphs 24 and 25, is how this program operated. Let's look at calendar year 2020, the last year of this agreement. Funds were paid in January of 2020 based on sales from 2019. And then all of the reinvestment, the trips, the bonuses, whatever incentives are paid to employees, are paid from those funds that are paid at the beginning of 2020. So in this circumstance, Nebraska Furniture Mart is out nothing. They are using guardsmen's funds, those reinvestment funds, for year 2020. So if it has to be paid in 2021 as well, it's a pure windfall. Because there's no, they're not out anything. It is not set up as a commission system. But what about the fact that you have, sorry to interrupt you, but you have another provision that dealing with providing the details of the protection plan, where I think Opposing Council is right, that Nebraska Furniture Mart doesn't have to give a customer the guardsmen protection plan, but guardsmen does have a continuing obligation to provide it to customers who have already bought it. Right. And I agree that there could be circumstances in which different sentences or different provisions of a paragraph could create independent obligations. I agree with your honor. I haven't seen any of them in the case law. So I guess that is one example that we would still be required to provide a plan. But again, if we get back to the plain language of the term that is at issue, the term that they want to survive has no meaning whatsoever outside of the provision that describes what this trade program is. It doesn't say you're paid dollars. It doesn't say you're paid a percentage of sales. It says you are paid the trade program. And that that term only gets meaning by looking at the other terms in that clause. And so, again, when we step back and look at the clause that's actually operative here, the survival clause, we're looking at whether context reasonably requires this. And I don't think it's any reasonable construction of this to say that the express term, the only benefit to guardsmen in this term, the reinvestment of those funds, can simply be read out of this agreement through the survival clause. So what is your view of the funding program agreement? So it was signed in 2020 on March the 19th. And does tell the reader what the 5% is based on, which is net receipts and the method of payment and the rebate amount. So how do you overcome what seems to be a pretty clear statement of what is to be paid? Two points on that, Your Honor. First, I believe the argument is that this is an actual amendment, and this was getting to your questions at the end. I don't think it can be because it's unsigned. I'll return to that point in a moment. I want to directly answer your question about where this 5% comes from or what is calculated. Even assuming that is the same 5%, I think that puts you right back into the retailer agreement, which describes what has to happen with that 5%. So even if you assume that this is enforceable, that this is somehow an amendment to the contract, if you look right above the signature line on page 29 of the appendix, it says, By signing this form, you confirm that all information stated above is accurate and will be upheld via the vendor-master agreement. Now, that's not a defined term, but what NFM is telling you in their briefing is that that vendor-master agreement is the retailer agreement. It's the principal contract. So simply stating this 5% on this form, I don't think changes any of the obligations of either party because the form specifically says, refers back to what they believe is that other agreement. I think the fundamental critical point, though, is that this can't be a valid amendment because it is unsigned. And it's not just that it doesn't contain a signature. If you look at page 29, there's a specific place for Nebraska Furniture Mart to check a box and initial whoever approved this by NFM, and that's blank. So it's not just that we don't have their signature on it. It's more than that. It's that there's a place for a signature and that the signature doesn't exist there. Also, I think that the case that they're referring to that they rely on extensively in the briefing is the Pepsi bottling case, and they cite it for the proposition that parties can use whatever means that they want to to amend an agreement. As a general matter of contract law, I think that's right. The problem is here that the parties have expressly decided the means by which they are going to amend this agreement, and they included a term in their contract to specifically state that. So if the court looks at appendix page 48, it's paragraph 10E, and it specifically says, This agreement may be amended or supplemented only in a written agreement signed by both parties. So we've got an express term here that says the only way that we can amend it, signature by both parties, and that doesn't exist here. It's not like Pepsi bottling where they were talking about the general sort of common law rule that you can't amend a written agreement other than by written agreement, and in that case, there was a 15-year course of dealing between the parties that was changing price terms, and so the court said, again, in the absence of an express term that said this can only be amended in writing by both parties, that we'll use evidence of the parties' course of dealing to allow the amendment. Here, one, you don't have course of dealing evidence that's anything like that, but second, and the most critical distinguishing characteristic here, you have the express agreement between the parties. That's exactly what Pepsi bottling says is that the parties can decide between themselves how they want to amend their agreement. They did exactly that here. In the principal agreement, they set out the ways that they could amend this, and that was not met. It was not a—it's not—the version proffered to the court is not an agreement signed by both parties. So that—I think that's an interesting point that the main agreement does require signature by both parties, but could it be an independent agreement then? Because I think your interpretation, perhaps, and you can disagree with me, gives that later document no effect whatsoever. It's almost like the parties didn't sign—well, the guardsmen didn't sign, and it doesn't exist, and I'm trying to figure out then what purpose that serves or what we do with it. Right, and I mean, candidly, I've been trying to figure out the purpose of this agreement as well. There is not an evidentiary record for that. Best I can tell, these are forms that Nebraska Furniture Art has to sort of quickly inventory their contractual relationships with vendors, which, understandably, they would have thousands, right? And so this is sort of a quick reference for what terms of the other agreement are. And I think the critical point to your question, Judge Strass, is whatever effect we give this, if it's an independent agreement, whatever it is, above that signature line, we come back to that same language that refers back to the terms of the vendor-master agreement, which they contend is the principal agreement here. So in any circumstance, I think the funding program is a losing argument here for my friend, because it's either not an amendment and it can't do anything that way, or it has some sort of contractual effect. Again, I don't totally understand how we get there, but let's say it has some effect. It puts them right back into the same position of having to comply with those terms, of the agreement, or the paragraph in the principal agreement. The last point I'll make is if we return to, again, the principles of Delaware law that tell us that the independent terms have to be read in context of one another and that they have to – we use the plain language of the contract to determine the intent of the parties, right? So Delaware is an objective state. I agree with my friend on that point. And so we use that plain language to determine what the intent of the parties is. The only reasonable construction of this agreement is that both parties get the benefit of their bargain. This program is set up so that these dollars must be reinvested. There's no construction of this document that makes any sense. And again, to return to the bonus or commission point, that is simply not how this agreement was set up. And in fact, the other point I'll make on that is if you look at the terms of the – the actual payment terms of the agreement, in other words, what each side was getting for this, and my friend alluded to this, the discount that Nebraska Furniture Mart received on these plans. That's how Nebraska Furniture Mart made money on this agreement, right? So they report to Garbsman the plans that have been sold. Garbsman invoices them for those sales. If they timely make payment on those, they receive a discount in the principal agreement. That's 7 percent. So they make 7 percent by remitting those funds that they've been paid by the customer. So that's the payment mechanism. And then we have this separate provision that calls for reinvestment. And so construing all those terms together, as we're required to do under Delaware law, the only reasonable construction here is that this term is tied together with the other obligations. The district court was absolutely right to construe it that way. The terms rise or fall together. Here the contract laps, and so there's no payment required. What does reinvestment look like? I assume it could include training, but I'm really getting at the commission point, which is suppose that the reinvestment is we're going to pay you 5 percent for any Garbsman programs that you – in which case your argument that this doesn't look like a commission agreement is sort of undermined by that. Right. I understand your point. The only – well, let me make two points on that. First, it is paid with the prior year's dollars, right? So again, they're not out anything because it's based on that prior year's sales. But secondly, the only evidence – if I may finish thinking. Maybe I should think. The only evidence that's in the record, I believe, is paragraph 25 of the stipulated facts. I can get it for you here real quick. Yes, it's 25 that they're – so vacation packages, pizza parties, other similar rewards that are paid to – now, can cash bonuses be part of that? I think the answer is yes. Yes, cash bonuses are included in that, but again, that's based on prior year's sales of dollars, so it doesn't make sense to apply that term when those funds can no longer be reinvested in the way that the parties have practiced in the past. I proceed. Thank you, Your Honor. A few quick points. One is to note that my friend referenced a couple of times that Nebraska Furniture Mark was out nothing if the payment wasn't made, and that's simply not correct. Nebraska Furniture Mark was under a continuing contractual obligation to sell the guardsman plans and only the guardsman plans in calendar year 2020 with respect to these categories. This was part of the exchange tied to that exclusive relationship between the parties. I would also note that the bottom of the funding program agreement, where my friend makes much hay about the fact that there's something for Nebraska Furniture Mark to do there, the heading above it says, This is clearly a part of the document that is used once guardsman sends it back for Nebraska Furniture Mark to designate how it is to be filed and used on its end. It has nothing to do with the mutual exchange of promises between the parties. What do you do with the argument that the retail agreement actually requires signatures by both parties to amend the agreement? So you might be right as a general matter, but here the agreement is clear about how you amend. Well, there's two points there, Your Honor. One is the Pepsi case is the clearest example of this. It says in no unequivocal terms, and there are similar provisions in the restatement because it's black-letter law, parties cannot limit their ability to amend the contract in the future. Think of it this way. The parties are free to amend how they can amend the agreement. What continues to govern is contract law principles, such as mutual assent and things of that nature. That's what happened in Pepsi, where the price that Pepsi was charging its bottlers, the price that Pepsi was charging its bottlers had changed over time, and there was no mutual writing that said that would happen, and the court said, well, even though the contract limits or purports to limit how those changes can be made in the future, you can't trump contract law. If there's a contract or an amendment, there's a contract or an amendment. Thank you, Your Honor. I'm going to ask the judge to reconverse. Thank you, counsel. I appreciate your arguments this morning. The case is submitted, and the court will render a declaration of state of the law.